# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HONEYWELL TECHNOLOGY SOLUTIONS, INC.** ) ) ) ) vs. ) ) ) **DEPARTMENT OF THE AIR FORCE,** ) ) _____Defendant._____ ) | **Civ. No. 05-1772 (TFH)** |

### Memorandum Opinion

Pending before the Court are the parties' cross motions for Summary Judgment and a Motion to Strike by HTSI. This is a "reverse-FOIA" suit in which plaintiff Honeywell Technology Solutions, Inc. ("HTSI") asks the Court to permanently enjoin the Air Force from disclosing certain information contained in and related to a contract between the two parties pursuant to a FOIA request that the Air Force received. After carefully considering the motions and the record of this case the Court remands in part, grants HTSI's summary judgment motion in part, denies the Air Force's summary judgment motion in part, orders production of certain documents, and holds the Motion to Strike in abeyance.

## I.   Background

### A.   The Air Force-HTSI  Contract

The Air Force has procured technical services for its satellite and other space-systems and their associated ground systems for decades.  One such system is the Air Force Satellite Control Network (the "AFSCN").  In 2000, the Air Force wished to contract a company to assist with maintaining and evolving the AFSCN, so it issued a Request for Proposals No. F04701-00-R-0006 (the "RFP").  The RFP included a performance-based statement of work (the "PB-SOW"), which only described desired outcomes of the contract.  It also provided the "color" of money (*i.e.*, procurement, research and development, etc.), identified applicable contract line items ("CLINs"), and the award fee percentage for each CLIN.

HTSI thus developed its own Statement of Work ("SOW"), Integrated Master Plan ("IMP") and Integrated Master Schedule ("IMS") that described its own unique technical solutions showing how to achieve the outcomes described in the PB-SOW.  HTSI then allocated costs among various CLINs that the Air Force provided.  The RFP apparently broke down the CLINs substantially as follows:

| FY | Color of $ | Est. Hours | Core Hours | Hrly Rate | Est. Cost | Award Fee | Total Est. Cost + Award Fee |
|---|---|---|---|---|---|---|---|
| 02 | (3400) | xxx | xxx | $xxx | $xxx | %yy | $xxx |
| 03 | (3400) | xxx | xxx | $xxx | $xxx | %yy | $xxx |
| 04 | (3400) | xxx | xxx | $xxx | $xxx | %yy | $xxx |
| 05 | (3400) | xxx | xxx | $xxx | $xxx | %yy | $xxx |
| 06 | (3400) | xxx | xxx | $xxx | $xxx | %yy | $xxx |
| 07 | (3400) | xxx | xxx | $xxx | $xxx | %yy | $xxx |

Compl. ¶ 13. The CLIN breakdowns support HTSI's SOW, IMP, and IMS. The PB-SOW also contained a section describing the criteria that would be used in evaluating the bidders' proposals ("Section 3.1"). The RFP indicated that bidders could propose amendments to Section 3.1. Admin. R. ("AR") 60. HTSI apparently amended Section 3.1 to make it better conform to its proposals.

The RFP designated some work activities as "core" requirements. Core requirements were those "necessary to maintain the AFSCN at its minimum operational level without impacting the AFSCN mission." PB-SOW ¶ 1.1; AR 5814. Non-core work was apparently anything beyond core work and "may be authorized" under the Contract. *Id.*

The Air Force awarded HTSI Contract No. F04701-02-D-0006 (the "Contract") effective December 21, 2001 for supplies and services to sustain and evolve the AFSCN. The Contract consists of a base period of six years and three option periods of three years each.

B. The FOIA Request and Initial Responses

On January 20, 2005 the Air Force received a FOIA request from The FOIA Group, Inc. seeking a copy of the Contract (the "FOIA Request"), including the PB-SOW, loaded rates, all modifications, delivery orders, and task/delivery orders. AR 13. The FOIA Group apparently gathers competitive information for government contractors like Lockheed Martin—*i.e.*, HTSI's competitors.

The Air Force notified HTSI of the FOIA Request via letter on February 2, 2005. AR 17. On February 28, 2005, HTSI responded, objecting to the release of several types of information. AR 20–24. HTSI considered such information protected under FOIA Exemption 4, which prohibits disclosure of "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Specifically, HTSI claimed that release of the information would cause "substantial competitive harm [to HTSI] and give an unfair business advantage to the FOIA requestor/competitor." AR 21.

HTSI argued that the release of labor rates would allow competitors to underbid HTSI in future competitions. Also, estimated labor hours and other price information would allow competitors to formulate a total contract price which would allow competitors to underbid HTSI in future bidding scenarios. Finally, HTSI argued that release of Section 3.1 would cause HTSI harm

- 4 -

because "these specific performance objectives were part of our proposal effort and are distinct HTSI-generated objectives." AR 23.

The Air Force responded on June 15, 2005, opining that HTSI had not met its burden to demonstrate that release of the information would likely cause substantial competitive harm. AR 26–29. The Air Force rejected HTSI's position that releasing labor rates would result in competitive harm because the "labor rates in themselves . . . do not reveal [HTSI's] overhead, profit margins, skill levels, labor mix or other sensitive information that might, if released, cause substantial harm to your competitive position." AR 27. The Air Force rejected HTSI's argument that releasing pricing information (estimated labor hours, rate information, line item pricing and total price information in the Contract, delivery orders, modifications and work authorization) would cause HTSI substantial competitive harm because the "total contract and program value [were] already public information." *Id*. The Air Force also argued that "there are so many variables used in calculating these figures that competitors cannot derive actual labor or material costs, indirect costs, or profit from obtaining this information." *Id*. The Air Force rejected HTSI's objection to the release of Section 3.1 because "[a]lthough offerors were able to make comments to and thereby affect the PB SOW, the PB SOW was funded and developed by the government. Even if the PB SOW were developed by mixed funding, you have not demonstrated that you have retained a legitimate proprietary interest in this data, necessary to prevent its release." *Id*. Thus, the Air Force indicated it would release

> [T]he price information, rate information, estimated labor hours, line item prices, and [Section 3.1] contained within the basic contract, and the labor hours, labor costs, material costs, rate information, total price and task descriptions contained within the work authorizations . . . . Only loaded rates, also referred to as "wrap rates" will be released, however. To the extent such information is further broken down into individual cost elements such as direct costs, labor skill mixes, overhead rates, and profit margins, this [information] will be withheld.

*Id*.

On June 21, 2005, HTSI asked the Air Force for permission to submit a more detailed response due July 30, 2005. AR 28. The Air Force Agreed. AR 30.

### C. HTSI's Final Response

In its final response letter of July 30, 2005, HTSI continued to object to the release of the following information:

(1) the estimated hours, core hours, hourly rate, estimated cost and total estimated cost plus award fee for each CLIN;

(2) the estimated hours, estimated cost and related funding values, and task description for those modifications, delivery orders, and work authorizations and later revisions from earlier included work scope that resulted from HTSI's proposals and incorporates HTSI's proposal that was developed voluntarily (collectively with category (1) above, the "Technical and Financial Information" or the "T&F Info"); and

(3) Section 3.1.

AR 31–32. HTSI argued that such information was protected under FOIA Exemption 4. Citing the well-established standards that govern that exemption elucidated in the seminal cases of *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974) and *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (D.C. Cir. 1992), HTSI made two main arguments as to why FOIA Exemption 4 protected the disputed information from disclosure.

First, HTSI argued that all the information was "voluntarily" submitted to the Air Force and it was not the type HTSI customarily releases to the public. Also, HTSI argued that the "non-core" technical solutions specifically were not required to be submitted by the RFP. Thus, such information was protected from disclosure under FOIA Exemption 4 as interpreted by *Critical Mass*. AR 36–37. Second, HTSI argued that even if the information was involuntarily submitted its release

would likely impair the government's ability to obtain necessary information in the future, and/or would likely cause HTSI substantial competitive harm. Thus, the information was protected from disclosure under *National Parks*.

The letter attached two affidavits that supported HTSI's arguments. The first was from Kimberly Ann Quail, Manager, Contract Drafting and Proposal Support for the HTSI unit that deals with the AFSCN. AR 44–51. The second affidavit is by Debra Brown, HTSI's Remote Tracking Station Block Change Program Manager for the HTSI unit that primarily serves the AFSCN. AR 52–58.

### D. The Air Force's Final Response

On August 18, 2005, the Air Force issued its final decision letter. The Air Force concluded that HTSI had not met its burden of showing that any of the contested information was exempt from disclosure under FOIA Exemption 4. A declaration of a Mr. James Batchelor accompanied and supported the letter's findings. Thus, the Air Force stated it would release HTSI's T&F Info over its objections, including "estimated hours, core hours, hourly rate, estimated cost and total estimated cost plus award fee for each CLIN, [Section 3.1], and the estimated hours, estimated cost, related funding values and task descriptions contained within the modifications, delivery orders, and work authorizations." AR 4. Again, the Air Force stressed that only "wrap rates" would be released, and not individual cost elements. Further, the Air Force "agreed to withhold unit prices, whether option or CLIN prices, to the extent they relate to future work" in deference to the holding in *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182 (D.C. Cir. 2004). AR 9. The letter defined "future work" as work occurring after September 30, 2005. *Id.*

E. Initial Lawsuit and Remand

HTSI filed its complaint in this case in September 2005. On November 1, 2006, the Court stayed the case pending the D.C. Circuit Court's ruling in *Canadian Commercial Corp. v. Dep't of the Air Force*, 514 F.3d 37 (D.C. Cir. 2008), a case involving substantively similar issues to those raised in this case. Following the D.C. Circuit's ruling in *Canadian Commercial*, this Court remanded this case to Defendant for reconsideration of its decision to release the documents at issue in this matter. On August 24, 2009, the Air Force determined that its original decision to release the contested information over HTSI's objections was still appropriate. AR 1. The Air Force argued that the ruling in *Canadian Commercial* was narrow and fact-specific and contained nothing that would undermine its August 18, 2005 decision. Thereafter, HTSI and the Air Force filed Motions for Summary Judgment.

## II. Standard of Review and the Parties' Burdens

Summary judgment is appropriate when the record demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court reviews this case under the Administrative Procedures Act, and will set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, courts do not substitute their judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Instead, the Court need only determine whether the agency made "a clear error of judgment." *McDonnell Douglas Corp. v. U.S. Dep't of the Air*

*Force*, 215 F. Supp. 2d 200, 204 (D.D.C. 2002) (citations and internal punctuation omitted), *aff'd in part, rev'd in part*, 375 F.3d 1182 (D.C. Cir. 2004).

"[T]he party seeking to prevent a disclosure the government itself is otherwise willing to make assumes [the] burden" of justifying nondisclosure. *Martin Marietta Corp. v. Dalton*, 974 F. Supp. 37, 40 n.4 (D.D.C. 1997). Thus, HTSI had the burden before the Air Force to justify non-disclosure. However, the Air Force must meet [HTSI's] arguments and evidence to the contrary with a "well-reasoned, logical[,] and consistent" decision that is "at least as compelling" as HTSI's. *McDonnell Douglas*, 375 F.3d at 1191 (citations and internal quotations marks omitted). In short, "[i]t is enough that the agency's position is as plausible as the contesting party's position." *McDonnell Douglas*, 215 F. Supp. 2d at 205.

## III.   Analysis

FOIA Exemption 4 protects from mandatory disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). The Trade Secrets Act, 18 U.S.C. § 1905, prohibits the government's discretionary disclosure of information in its possession "not [otherwise] authorized by law," *i.e.*, FOIA. For disclosure purposes, the Trade Secrets Act's scope is "at least co-extensive with that of Exemption 4 of FOIA." *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1151 (D.C. Cir. 1987), *cert. denied*, 485 U.S. 977 (1988). Thus, the Trade Secrets Act prohibits disclosure of information covered by Exemption 4. The parties do not dispute that the contested information is "commercial or financial" information, or that HTSI is a "person" within the meaning of Exemption 4. The parties do dispute several other aspects of the exemption, however, discussed in turn below.

## A. Voluntary v. Involuntary Submissions

If commercial or financial information is submitted to the government involuntarily then the government must treat such information as "confidential" under Exemption 4 if its disclosure would be likely either to "impair the government's ability to obtain necessary information in the future", or to "cause substantial harm to the competitive position" of the submitter. *National Parks*, 498 F.2d at 770. If the information is submitted voluntarily, then the information is "confidential" under Exemption 4 if it "would customarily not be released to the public by the person from whom it was obtained." *Critical Mass*, 975 F.2d at 878 (internal quotation marks and citation omitted). HTSI argues that *Critical Mass* governs, while the Air Force argues that *National Parks* is the correct standard.

Precedent in this circuit "uniformly and firmly points to the conclusion" that, as a general matter, when HTSI submitted this information to the Air Force, it did so involuntarily because it had to submit such information in order to be considered for the Contract. *See Martin Marietta*, 974 F. Supp. at 39 (collecting cases). Indeed, HTSI tells the Court that

> [T]he language in the RFP put offerors on notice that the Air Force would make award based on which proposal offered the best value to the government and further stated that it would determine the best value to the government by evaluating the specific allocation of the costs . . . by CLIN . . . . This information was fundamental to [HTSI's] strategy to win the Contract and is the very information being sought in the FOIA request.

Pl.'s Br. Summ. J. 4–5, ¶ 8. The wording of the RFP supports this statement. *See* AR 60–61; RFP ¶ 2.2 ("The Offeror *shall* prepare the proposal as set forth in Table 2.1", a table listing many documents, including the SOW/IMP/IMS, PB-SOW, and other documents likely to contain

information at issue here) (emphasis added). HTSI points to nothing in the RFP indicating that HTSI could have omitted portions of its submissions (other than those discussed below) and still be considered for the Contract. The Air Force explained that "[a]ny offeror . . . was compelled to submit a comprehensive proposal covering each aspect of the government's requirements . . . if it hoped to be competitive for award." AR 5–6. The Air Force's argument here is at least as plausible—indeed, it is more plausible—as HTSI's argument, and is amply supported by legal precedent. The Court, therefore, has little trouble determining that the contested information is generally governed by the *National Parks* standard unless some specific exception applies.

Such exceptions may apply. Indeed, there is precedent in this Circuit for treating certain information submitted as part of a bid for a government contract as voluntarily submitted while treating accompanying information as involuntarily submitted. *See Mallinckrodt, Inc. v. West*, 140 F. Supp. 2d 1, 6 (D.D.C. 2000) (reverse FOIA suit) (distinguishing between information that was "required" to be submitted under the contract solicitation and information that "should" be included under the solicitation); *Cortez III Serv. Corp. v. NASA*, 921 F. Supp. 8, 12–13 (D.D.C. 1996) (reverse FOIA suit) (finding some information submitted as part of a bid "voluntary" because there was no firm evidence that the information "was required . . . in order [for the bidder] to continue to compete for the contract.").

Applying such distinctions to this case, the parties contest whether the RFP required the submission of "non-core" work solutions. In making their arguments, the parties rightly focus on the wording of the RFP. Although the record contains the PB-SOW, it only contains portions of

the rest of the RFP (*see* AR 59–111), and two pages of such portions are illegible (AR 59 and 63).[1] Because the wording of the RFP is the crucial factor here, the Court finds that without a complete and legible version of the RFP before it there exists a genuine dispute as to a material fact. Thus, summary judgment is inappropriate at this stage regarding this issue.[2]

The Court will therefore order the parties to file a complete and legible version of the RFP with the Court for its consideration before the Court rules on whether the RFP required submission of "non-core" work solutions. *See Public Citizen Health Research Grp. v. FDA*, 964 F. Supp. 413, 416 (D.D.C. 1997) (deferring a summary judgment ruling in a FOIA case until the parties submitted certain documents *in camera* so the court could review them in order to determine the likelihood of competitive injury flowing from their release).

## B. The *National Parks* Test

### i. *Government Impairment Prong*

HTSI argues that if the information being sought is released, it would likely impair the government's ability to obtain similar information in the future. AR 38–39. Specifically, HTSI

---

[1] The Quail affidavit apparently refers to at least one of these two illegible pages to support HTSI's arguments regarding the voluntary submission of the "non-core" information. Quail Aff. ¶ 14; AR 48.

[2] The record also suggests that Section 3.1, as revised by HTSI, may have been voluntarily submitted under these standards. The RFP indicated that "Government supplied documents *may* be revised provided the changes enhance rather than degrade RFP requirements." AR 60 (emphasis added). The RFP identifies the PB-SOW as a Government-supplied document. AR 61. Thus, it is unclear that revising Section 3.1 was necessary for the bid. However, because HTSI did not raise this specific argument, and because the Court finds that Section 3.1 should not be released even under the more stringent *National Parks* test, the Court need not determine this issue.

claims that "without an understanding that the information would be treated confidentially, [HTSI] would not likely have cooperated and submitted the [T&F Info and Section 3.1] to the Air Force." AR 39. The Air Force claims that it is in the best position to gauge its interests in this context, and that "the type of information to be released here has been routinely released in the past in response to similar requests and yet the Government finds no dearth of proposals for its multi-million dollar contracts." AR 6.

"The government agency from which disclosure is sought is in the best position to determine whether an action will impair its information gathering in the future. . . . [A] party opposing disclosure makes little headway in raising the issue of impairment of information gathering on the agency's behalf." *McDonnell Douglas*, 215 F. Supp. 2d at 206. Underlying this reasoning is the policy that when an agency "*wants* to disclose the disputed . . . information, it would be nonsense to block disclosure under the purported rationale of protecting government interests." *Comdisco, Inc. v. Gen. Servs. Admin.*, 864 F. Supp. 510, 516 (E.D. Va. 1994) (emphasis in original).

The Court agrees with the Air Force. First, nothing in the record indicates that the Government ever assured HTSI that this information could not or would not be released pursuant to a FOIA request. Second, as a large government contractor, HTSI surely was aware that courts have authorized release of similar information in other FOIA cases. *See, e.g., Martin Marietta*, 974 F. Supp. 37 (finding that CLIN information, unit pricing, and cost and fee information in certain contracts was not protected by Exemption 4 and ordering its release). Third, the claim that HTSI would abjure the opportunity for a multi-million-dollar contract to avoid a FOIA disclosure strains credibility. Fourth, the Court notes HTSI's inconsistent positions in the record regarding

- 13 -

the likelihood that HTSI would not have produced the information to the government under these circumstances. *Compare* HTSI Final Position Letter (July 30, 2005) (AR 35) ("[I]t is *likely* that [HTSI] would not have produced the [T&F Info] voluntarily if it understood this sensitive information would have been made public.") (emphasis added) *with* Quail Aff. ¶ 15 (AR 48) ("[HTSI] *would not have* voluntarily submitted the [T&F Info] to the Air Force if it had known it would ultimately be released to the public . . . .") (emphasis added). Fifth, HTSI presents no evidence that it or any other government contractor has withheld such information for fear of FOIA disclosure. Finally, if HTSI could successfully invoke the government-impairment prong with conclusory and unintuitive statements as those offered here, it could transform the prong into a *de facto* prohibition on disclosure. The Air Force's position here is more compelling than HTSI's, and thus HTSI's argument must be rejected.

### ii.    *Substantial Competitive Harm*

The main issue in the record is whether releasing the information would likely "cause substantial harm to the competitive position" of HTSI. *National Parks*, 498 F.2d at 770. The Air Force's reasoning that HTSI would not likely incur substantial competitive harm as a result of disclosure can be categorized as follows: (i) HTSI did not demonstrate that it faces "actual competition"; (ii) The T&F Info did not reveal sensitive information such as cost elements; and (iii) Section 3.1 merely described criteria by which HTSI would be judged in meeting the Government's needs, and did not reveal any sensitive information such as cost elements or technical solutions. The Court addresses each in turn.

a. *Actual Competition*

In its final decision letter of August 18, 2005, the Air Force argued that HTSI had not shown that it faced "actual competition" regarding the AFSCN Contract because "the government ha[d] no intent of re-competing this contract before its natural termination. . . . Therefore, HTSI does not presently face actual competition for work related to the [AFSCN] contract." AR 7. HTSI argues that this reasoning is too narrowly focussed, and the Court agrees.

It is true that HTSI must put forward evidence of actual competition. *See Gulf & W. Indus., Inc. v. United States*, 615 F.2d 527, 530 (D.C. Cir. 1979). But "such evidence need not be of actual competition over th[is] particular contract[.]" *General Elec. Co. v. Dep't of the Air Force*, 648 F. Supp. 2d 95, 103 (D.D.C. 2009) (citing *National Parks*, 498 F.2d at 771). Thus, HTSI need only present evidence that it faces competition regarding the types of services offered under the Contract.

HTSI presents such evidence. HTSI asserted before the Air Force that it faced competition with respect to at least four other upcoming contracts in the government space industry including (1) the Eastern Range Test Support contract for the Air Force 45th Space Wing; (2) Engineering Development and Sustainment; (3) Joint Base Operations and Support contract for the NASA /Kennedy Space Center and Patrick AFB, and (4) Network Support Operations and Maintenance for the Air Force 50th Space Wing. AR 50. Indeed, the very names of such contracts indicate they probably involve similar if not identical services as those offered under the AFSCN Contract. Also, because the AFSCN Contract is such a comprehensive contract, it is reasonable to assume

that some of the myriad of services offered thereunder would be relevant to some other upcoming government contract. Finally, the Court is mindful that a group representing HTSI's major competitors is apparently behind the FOIA request at issue here. HTSI thus did indeed present sufficient evidence of "actual competition" under the legal standards of this circuit.

b. *The T&F Info*

At last, the Court arrives at the thrust of the case, and the specific issue to which the lion's share of the record is dedicated: Would the release of the T&F Info likely cause substantial harm to the competitive position of HTSI? Regarding the T&F Info—as the Court has defined it in this opinion—the Court concludes that the record suffers from a frustrating ambiguity, *i.e.*, what HTSI's arguments were, and to what arguments the Air Force reasonably thought it was responding. The Court detects three possible theories of why the T&F Info is sensitive:

- Argument 1: Because it reveals *how work is being done*. That is, the unique, substantive work solutions presumably described in the SOW/IMP/IMS. Competitors can then copy such work solutions.
- Argument 2: Because it reveals *how HTSI allocates resources*. This is distinct from Argument 1 because the facial CLIN values and perhaps other information such as work orders are sensitive here, even if it is unclear how the underlying work is being done. For example, competitors may be able to take a HTSI-completed CLIN, shave off a cost percentage, and submit that as a bid in a future option year for this contract or a similar future contract, thus underbidding HTSI. Or, competitors can adjust "core" versus "non-core" allocations of work to copy HTSI's allocations.
- Argument 3: Because it reveals *granular cost elements* such as HTSI profits, skilled labor rates, or materials costs. Competitors can then use the information to construct how much HTSI will bid in future jobs and thus underbid HTSI. HTSI customers may also be able to use this information to "ratchet down" costs of certain goods or services in future negotiations with HTSI.

- 16 -

But HTSI's July 30, 2005 letter and its supporting affidavits seem to muddle these three theories. Examples of this trend include, but are not limited to:

1. Stating that the CLINs reveal HTSI's "complex and strategic work allocation and pricing strategies". AR 34. This substantially states Arguments 1 and/or 2.

2. Stating that disclosure would show HTSI's "allocation of skilled workers amongst the CLINs, allocation of development versus sustainment work, allocation of core versus non-core work, insight into trends in [HTSI's] rates and estimated hours over time…" AR 34. This substantially states Argument 2 and possibly Argument 3.

3. Stating that disclosure would "permit competitors to determine the components of [HTSI's] costs and undercut [HTSI] in competition." AR 34. This is a clear statement of only Argument 3.

4. Stating that the T&F Info contains HTSI's "technical solution to perform the work [*i.e.*, Arguments 1 and/or 2], labor hours and loaded rates, and its cost structure and allocation of costs [*i.e.*, Argument 2]." AR 35.

5. The Brown Affidavit indicates that competitors can "easily determine [HTSI's] strategy for performing and growing work under the Contract", substantially stating Argument 1 and/or 2, but then ties this harm to the danger of "out bid[ding HTSI] in future government contract competitions", which appears to be a concern primarily raised by Arguments 2 and 3. AR 55.

6. The Quail Affidavit states that cost allocation between CLINs "forms the heart of [HTSI's] strategy to win the Contract" (Argument 2; AR 47) but then immediately launches into a much more particularized discussion of how the T&F Info can be used to derive certain costs and concludes that "[i]f [HTSI's] competitors have its [T&F Info] they can easily determine [HTSI's] costs [*i.e.*, Argument 3] and adjust their own technical strategies and cost structures [*i.e.*, Argument 2] to underbid [HTSI] in future government contract competition." AR 49.

Also, HTSI's July 30, 2005 letter focused its attention on Argument 3. Indeed, many of the clearest statements of Arguments 1 and 2 are found in the "Background" section of the letter, and in the section discussing competitive harm HTSI states, apparently summarizing its position, that

> In the instant case, [HTSI] has asserted that disclosure of its CLIN price information, along with estimated hours and loaded labor rates would allow its competitors to derive the values that [HTSI] assigns to certain costs, much in the same way as McDonnell Douglas'[s] competitors could potentially calculate its subcontractor markup percentage [in *McDonnell Douglas*, 375 F.3d 1182].

AR 40. This appears to be a clear statement of only Argument 3. The Air Force apparently only responded to Argument 3. Thus, if the Court credits HTSI with having made Arguments 1 and 2, then the Court could find that the Air Force did not meet its burden in rebutting those arguments.

The Court first notes that HTSI at least appears to state Arguments 1 and 2 in the record, as demonstrated by the examples discussed above. HTSI's statements regarding Argument 2 appear relatively clear. However, the Court also considers HTSI's framing of these two arguments as confusing, particularly given HTSI's focus on Argument 3. To borrow an oft-cited policy of contract law, the Court considers it equitable to resolve this ambiguity against the party who drafted the ambiguous document, *i.e.*, HTSI. *Cf. Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 62 (1995) ("[T]he common-law rule of contract interpretation [is] that a court should construe ambiguous language against the interest of the party that drafted it."). At this summary judgment phase, this specific policy can be more generally stated as the principle that "the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in his favor." *Graves v. Dist. of Colum.*, Civ. Action No. 07-156 (CKK), 2011 U.S. Dist. LEXIS 40463, at *15 (D.D.C. Apr. 14, 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Under these circumstances, it is the Air Force that benefits from such principles.

The Court therefore remands the case to the Air Force so that the Air Force may clarify its position as to what it considers HTSI's arguments to be, and to respond to Arguments 1 and 2 to the extent that it feels that HTSI raised them in the existing record.[3] *See McDonnell Douglas*, 375 F.3d at 1188 n.2 ("[W]e will remand a matter to an agency where the agency's initial explanation of its decision was inadequate . . . ."); *McDonnell Douglas Corp. v. Widnall*, 57 F.3d 1162, 1167

---

[3] The Court reserves final judgment as to what it considers HTSI's arguments to be until after this remand.

(D.C. Cir. 1995) (ordering a remand when the court was presented with a "confusing administrative record"). The Court stresses that it envisions no further remands lest the case become "a never ending loop from which aggrieved parties would never receive justice." *McDonnell Douglas Corp. v. NASA*, 895 F. Supp. 316, 319 (D.D.C. 1995). The Air Force shall file its response within 90 days from the date of this order. The Court will determine at that time whether supplemental summary judgment briefing is necessary.

### c.  *Section 3.1*

HTSI argued that Section 3.1 is sensitive because, on its face, it shows how HTSI structures its outcome criteria, and thus "reflects . . . its strategic approach" which "would provide great insight for competitors to determine how to structure their award fee plans in any future competitions." Brown Aff. ¶ 12; AR 57. The Air Force countered that the criteria doesn't contain "HTSI's assumptions . . . the skill mix, materiel, overhead, profit or technical solutions proposed to meet [these criteria] or any other information pertaining to HTSI's unique technical approach." AR 9.

The Air Force's response misses the mark. Unlike with the T&F Info, HTSI's argument here appears clear and coherent. HTSI argues that on its face the information's structure is sensitive and can be copied by competitors to HTSI's detriment. The Air Force, rather, focuses on what can be derived from the information and thus does not rebut the substance of HTSI's argument. Moreover, the Court considers it illogical that a bidder such as HTSI would alter such criteria or why the Air Force would even allow a bidder to do so unless the criteria alterations themselves were a substantive part of the submission and were a relevant aspect of why HTSI won the Contract.

- 19 -

The Air Force is further mistaken that HTSI never argued in the record that release of Section 3.1 would likely result in competitive harm. HTSI objected to its release in the July 30, 2005 letter (AR 34) and stated in its February 28, 2005 letter that "[r]elease of this . . . information [including Section 3.1] . . . would result in direct competitive injury to HTSI[.]" AR 23.

Thus, the Court awards summary judgment to HTSI regarding this issue. The Air Force will therefore be permanently enjoined from releasing Section 3.1, as revised by HTSI, pursuant to this FOIA Request.[4]

## IV.    Motion to Strike the Declaration of Timothy Pink

HTSI moves to strike the Declaration of Mr. Timothy Pink, which accompanies the Air Force's Reply in support of its summary judgment motion. Pl.'s Reply 6–7. Mr. Pink is the Chief of the Contracting Office and Supervisory Contract Specialist for the Satellite Control and Network Systems Group at the Space and Missile Systems Center. The declaration focuses on why information related to "non-core" work should be deemed involuntarily submitted under the RFP. HTSI claims that it improperly supplements the existing administrative record with "a *post-hoc* explanation of the Air Force's decision that is not reflected in the Air Force's August 18, 2005

---

[4]     This order accords with the Air Force's submission that this injunction be limited in scope to this particular FOIA Request. Def.'s Mot. Summ. J. 2 n.1. It is unclear whether the Air Force included this remark because it considered HTSI's position to be that the Court should permanently enjoin the release of the information in any future context, or at least in any future FOIA context. *See* Compl. 15 (requesting a permanent injunction against disclosure); Pl.'s Mot. Summ. J. 2 (same); Pl.'s Br. Summ. J. 35 (same); Pl.'s Reply 25 (same). Although HTSI does ask for a permanent injunction, the Court considers the prayer as limited to this specific FOIA Request. Indeed, the Court would exceed its mandate in issuing anything beyond that. "An injunction must be narrowly tailored to remedy the specific harm shown." *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976). Because this case is decided only upon the adequacy of this one particular administrative record, the injunction is properly limited to this FOIA request.

decision letter". *Id.* 7 (emphasis in original). "Although the record may be supplemented to provide, for example, background information or evidence of whether all relevant factors were examined by an agency, the new material should be merely explanatory of the original record and should contain no new rationalizations." *AT&T Info.-Sys., Inc. v. Gen. Servs. Admin.,* 810 F.2d 1233, 1236 (D.C. Cir. 1987) (internal citations and quotations marks omitted).

This motion directly relates to the main issue of whether the "non-core" information HTSI submitted in response to the RFP was "voluntarily" submitted to the Air Force. The Court has already explained that it feels the need to have a complete and legible version of the RFP before it determines that issue. Accordingly, the Court will hold this motion in abeyance until it is in a position to decide the main issue to which it relates.

## V.     Conclusion

For the reasons stated above, the Court will therefore remand the case in part, grant summary judgment for HTSI in part, deny summary judgment for the Air Force in part, order the parties to produce documents to the Court, and hold in abeyance the Motion to Strike. An appropriate order shall accompany this memorandum.

April 19, 2011

Thomas F. Hogan
UNITED STATES DISTRICT JUDGE

- 21 -